**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSHUA L. HEARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11 C 1584 |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | Judge Rebecca R. Pallmeyer |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Joshua L. Heard claims that he is disabled by an ankle impairment and lower back pain. Heard seeks review of the final decision of the Commissioner of Social Security that Heard is not disabled for the purposes of disability insurance benefits under Title II of the Social Security Act. 42 U.S.C. §§ 416(I), 423(d). Because Heard's last insured date was March 31, 2004, he must establish that he was disabled in the 30 days after the alleged onset of his disability, March 1, 2004. Heard provided little evidence from that relevant period, and the Administration adopted the determination of its Administrative Law Judge ("ALJ") that the record did not support a finding that Heard was disabled during that brief time. For the reasons explained below, the court agrees and denies Heard's motion for summary judgment [18]. The Commissioner's cross-motion for summary judgment [23] is granted.

## FACTUAL BACKGROUND

### I.    Procedural History

In 1996, Heard suffered a severe ankle injury and underwent surgery to repair it. Except for a two-day stint at UPS (the record does not include the date), he has not been gainfully employed since then. He applied for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). (R. at 94, 96.) In earlier proceedings, the Social Security Administration determined that Heard's disability ceased in 2003.

At issue in this case is a claim for SSI and DIB that Plaintiff filed in March 2007. On that claim, the Social Security Administration awarded SSI benefits, but not DIB, concluding that the evidence did not establish a disabling impairment before March 2004. Heard appealed that determination and ALJ Regina M. Kossek conducted two hearings–one in November 2009 and a second one in April 2010. On May 6, 2010, ALJ Kossek issued her ruling. She determined that Heard was not disabled at any time from the alleged onset date (March 1, 2004) through his last insured date (March 31, 2004). Specifically, ALJ Kossek concluded that Heard can only occasionally climb, kneel, stoop, crouch, or crawl, and is dependent on a cane; and that he is unable to perform any past relevant work. ALJ Kossek determined that Heard is, however, capable of performing unskilled sedentary work as defined by 20 C.F.R. § 404.1567(a). (R. at 16-21.) Heard appealed ALJ Kossek's decision, and the Appeals Council denied review, making ALJ Kossek's decision the Commissioner's final decision pursuant to 20 C.F.R. § 404. 981. (R. at 1.) Heard now seeks review of the Commissioner's decision.

## II.    Medical History

Medical records relating to the relevant time period (March 2004) are meager. Those records document visits to Dr. Leonard R. Jubert, Heard's treating physician, and to Chicago Consulting Physicians. As described below, Heard was also examined by Dr. Villanueva of Chicago Consulting Physicians for the Bureau of Disability Determination Services on June 18, 2007. (R. at 318-22.) Heard's other medical records fall outside the pertinent time period or are irrelevant to this determination.[1]

### A.    Records from Dr. Jubert

Heard injured his ankle in 1996 and received treatment at Roseland Community Hospital,

---

[1]    For example, Heard provided miscellaneous reports documenting a visit to Little Company of Mary Hospital in Evergreen Park, Illinois in 2009 for a heart condition, but those records are not relevant to Heard's claim here that he was disabled by an ankle impairment and lower back pain. (R. at 385-408).

2

including the placement of screws in his ankle. (R. at 100.) Records show that Heard's podiatrist, Dr. Jubert, began treating Heard on November 15, 2003 for ankle pain caused by the accident and subsequent surgery. (R. at 370.) Although large portions of the handwritten notes in Dr. Jubert's records are illegible, the notes and associated medical billing codes from that first visit reveal that Dr. Jubert diagnosed Heard with arthritis in his right ankle, edema, pain, and varicose veins in his lower extremities.[2] (*Id.*) Dr. Jubert also ordered an x-ray and an arthrocentesis procedure on Heard's right ankle.[3] (*Id.*) There is no record that such a procedure actually took place, however.

Heard next visited Dr. Jubert on January 8, 2004, after re-injuring his ankle in a car accident. (R. at 18.) Dr. Jubert observed pain and palpitation in Heard's right ankle and diagnosed Heard with neuritis.[4] (R. at 369.) Dr. Jubert also ordered another x-ray and prescribed Prudoxin cream.[5] (*Id.*) At an appointment on February 3 in 2004 or 2005–the year cannot be determined from the record–Dr. Jubert diagnosed Heard with bursitis, planned a drainage procedure for Heard's right ankle, and prescribed Foltx, which is a combination of vitamins.[6] (R. at 368.) On January 31, 2006,

---

[2]     Dr. Jubert noted 2012 ICD-9-CM code 716.97, indicating "arthropathy," or joint disease, in the ankle and foot, and code 454.1, indicating "varicose veins of lower extremities with inflammation." DORLAND'S MED. DICTIONARY 160 (31st ed. 2007). The ICD coding system, the International Classification of Diseases, is a universal system for diseases and medications created by the Centers for Medicare and Medicaid Services and the National Center for Health Statistics. *See* 1 ICD-9 CM Table of Disease and Injuries §§ 454, 716 (6th ed. 2004).

[3]     Arthrocentesis is a procedure to remove synovial fluid, relieve pressure and pain, and diagnose arthritis in a joint. *See* 4 Med. Malprac. Chklsts. & Disc. § 26:86; Richard S. Irwin & James M. Rippe, INTENSIVE CARE MEDICINE ch. 24 (5th ed. 2003).

[4]     Neuritis is inflammation of a nerve accompanied by pain and tenderness. DORLAND'S MED. DICTIONARY 1282.

[5]     Prudoxin, or doxepin hydrochloride, is a drug administered orally to treat depression and chronic pain and used topically to treat itching. DORLAND'S MED. DICTIONARY 572, 1562-63.

[6]     *See Foltx*, WEBMD, http://www.webmd.com/ (date last visited Sept. 25, 2012). Bursitis is "inflammation of a bursa," which is "a sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop." DORLAND'S MED. DICTIONARY 267, 269.

Heard complained to Dr. Jubert of swelling in his ankle after twisting it three days earlier. Dr. Jubert again diagnosed Heard with arthritis in his right ankle, edema, and pain, and noted that Heard suffered a decreased range of motion and palpitations. (R. at 367.) Approximately five weeks later, in March 2006, Dr. Jubert saw Heard again, diagnosed bursitis, and planned a drainage procedure. (R. at 366.) There are no other legible records of treatment from Dr. Jubert within two years of the date last insured, March 31, 2004.[7] Dr. Jubert did later diagnose Heard with degenerative joint disease ("DJD", also known as osteoarthritis) in 2007.[8] (R. at 365.)

Dr. Jubert also completed arthritic and neurological reports dated April 23, 2007 for the Bureau of Disability Determination Services to evaluate Heard's eligibility for benefits. The arthritic report stated that Heard had degenerative joint disease and a restricted range of motion. Dr. Jubert reported that Heard used a cane at all times for walking, standing, and balancing, and that he is unable to stand for more than one hour. (R. at 308-09.) The neurological report noted that Heard used a cane or crutches, was unable to ambulate more than fifty feet without assistance, and that his right leg had atrophied. (R. at 311-12.) In the April 2007 reports, Dr. Jubert declared his then-current diagnosis for Heard was degenerative joint disease and complex regional pain syndrome.[9] (R. at 311.)

---

[7]     A record from Dr. Jubert diagnosing Heard as suffering from "DJD" (degenerative joint disease) is dated August 23, but the court is uncertain of the year. Its placement in the case record suggests it was August 2007, but the incomplete date notation suggests August 2006. (R. at 364.) In either case, the notation was from more than two years after Heard's date last insured.

[8]     Like Dr. Jubert's earlier notation for arthritis, the January 2007 medical record diagnosing DJD uses ICD code 716.97, indicating unspecified arthropathy (joint disease) in the ankle and foot. *See* 1 ICD-9 CM Table of Disease and Injuries §§ 715, 716 (6th ed. 2004). Though Dr. Jubert used the 716.97 medical code in both contexts, his later records clearly reflect a diagnosis of DJD while his earlier records note only arthritis.

[9]     Complex regional pain syndrome is "an uncommon form of chronic pain" in the leg that "typically develops after an injury, but the pain is out of proportion to the severity of the initial injury." *Complex Regional Pain Syndrome*, MAYO CLINIC, http://www.mayoclinic.com/ health/complex-regional-pain-syndrome/DS00265 (last visited May 29, 2013).

Along with his reports, Dr. Jubert provided a letter dated April 27, 2007 to the Bureau of Disability Determination Services. The letter summarizes the results from the x-rays conducted on November 15, 2003, and January 8, 2004, which revealed that a plate and several screws had been installed in Heard's right ankle to repair fractures at the tibia and fibula bones, and that two of the screws did not appear to be flush with the plate. (R. at 315.) Dr. Jubert observed that Heard's tibia, fibula, and talus bones appeared porous and brittle–"osteoporotic"–and there was "[s]evere narrowing of the talocrural joint space" on both x-rays.[10] (*Id.*) Dr. Jubert concluded that the x-rays from 2003 and 2004 showed "signs of Degenerative Joint Disease secondary to previously fractured surgically repaired tibia and fibula bones of the right ankle." (*Id.*)

### B. Records from Chicago Consulting Physicians

At the request of the Bureau of Disability Determination Services, Dr. Norma Villanueva–whose specialty is not noted–conducted an Internal Medicine Consultative Examination on June 18, 2007. (R. at 318-22). Heard's chief complaints at that time were a "[c]rushed right ankle and stomach ulcer." (R. at 318.) After a 40 minute examination, Dr. Villanueva reported that Heard had a history of right ankle fractures; possible secondary degenerative arthritis; lower back pain; possible arthritis; and a gastric ulcer. (R. at 318-20). Dr. Villanueva observed that Heard's gait was slow and that he could only walk or limp for ten feet without his cane, but his mental capacity was normal and he could manage his own financial affairs. Radiologist Dr. Joel Leland of the Chicago Consulting Physicians also conducted an x-ray of the lumbar region of Heard's spine on June 18, 2007. That x-ray showed that Heard had a normal lumbosacral spine: the alignment and the spacing between the vertebrae of Heard's spine was normal. (R. at 316-17.)

### C. Physical Residual Functional Capacity Assessments

Also at the request of the Bureau of Disability Determination Services, state agency

---

[10] The talocrural joint space is the space "pertaining to the talus and the bones of the leg" in the ankle. DORLAND'S MED. DICTIONARY 1893.

consultants conducted two physical residual functional capacity ("RFC") assessments on Heard. First, on June 27, 2007, Dr. Young-Ja Kim concluded based on Dr. Jubert's x-rays that Heard had suffered from degenerative joint disease in his right ankle since November 2003.  (R. at 330.)  Dr. Kim concluded that Heard should avoid "concentrated exposure to dangerous heights," but he could occasionally lift 20 pounds and frequently lift ten pounds; could stand or walk for approximately six hours in an eight-hour work day; and could sit for about six hours, though he was limited in his lower extremities because of his ankle fracture.  (R. at 324, 327.)  Dr. Kim believed that his findings were consistent with Dr. Jubert's conclusions.  (R. at 329.)

In a second RFC assessment conducted on November 6, 2007, Dr. Frank Jimenez concluded that Heard could occasionally lift ten pounds and could frequently lift less than ten pounds, but could stand or walk for significantly less than two hours in an eight-hour workday. (R. at 335.)  Dr. Jimenez also noted that Heard complained of back pain, but that the x-ray of Heard's spine was negative for abnormalities.  (R. at 341.)  Dr. Jimenez observed that Heard had not alleged any significant worsening of pain since the onset of his ankle impairment, though his gait was "slow and limping."  (*Id.*)  Dr. Jimenez concluded there was insufficient evidence of a disabling impairment on or before Heard's last insured date.  (R. at 333.)

## III.    Hearings before ALJ Kossek

### A.    Heard's Testimony

Born on December 25, 1959, Heard was 44 years old on his last insured date.  (R. at 20.) Heard lives alone in a basement apartment and has no more than an eighth grade education. (R. at 18, 113-14, 117.)  He never received any other formal training, and his reading and writing skills are limited, though he can read "a simple list" for shopping.  (R. at 117-18.)  At the first hearing before ALJ Kossek on November 4, 2009, Heard testified that he had injured his ankle in 1996 while painting a house.  Before his accident in 1996, Heard had worked as a drill press operator, an assembler placing animal cages in boxes, and a carpenter.  (R. at 130-31.)

6

Heard testified at the first hearing before ALJ Kossek that he visited Dr. Jubert and he received treatment at St. Bernard Hospital after his ankle surgery, but he could not remember other details about his treatment. (R. at 102, 104.) ALJ Kossek determined that the record was insufficient for a full review of Heard's medical history, and sent for additional records from Dr. Jubert and St. Bernard Hospital. (R. at 104-05.) The record from the second hearing includes a request for all medical records addressed to Saint Bernard Hospital, but the hospital responded that it did not possess any relevant documents. (R. at 343.) Hospitalization discharge paperwork in the administrative file from Advocate Health Care shows that in January 2000, Heard had a same-day procedure to remove the screws placed into his ankle. A post-operative appointment reminder also shows he scheduled an appointment for February 2, 2000 at Midland Orthopedics Associate, but there is no record from any such. (R. at 350-51.)

At his second hearing before ALJ Kossek on April 26, 2010, Heard testified that he had been seeing Dr. Jubert since 2004 and that he had consistently used crutches or a cane since 2004. (R. at 113-15.) Heard also testified that he cannot walk more than a block without his cane. (R. at 115.) According to Heard, lower back pain that he experiences "when [his] leg bothers [him]" prevents him from performing a sitting job because he becomes uncomfortable after sitting for around ninety minutes. (R. at 119-20, 124.) He also testified that in 2004 he was unable to mow his yard and relied on others to take him places most of the time, and that working was largely impossible for him because of his ankle and lower back pain. (R. at 121, 122-24.)

## B. Dr. Charous's Testimony

Medical expert Dr. Donald Charous testified at the second hearing before ALJ Kossek on April 26, 2010.[11] After reviewing Heard's history, medical records, and testimony, Dr. Charous

---

[11] Dr. Charous holds a medical degree from the University of Illinois and was licensed to practice medicine in 1958 by the State of Illinois. His license expired in July 2005. His primary specialty is Internal Medicine and his secondary specialty is Geriatric Medicine. (R. at 186.)

testified that Heard did not meet or equal a listing in 2004 because he was able to ambulate with a cane. (R. at 127). Dr. Charous noted that Heard was limited to sedentary work because his walking is limited, he uses a cane, and he has difficulty lifting objects above ten pounds with any frequency. (R. at 127). Dr. Charous added that he did not find any records of back pain in 2004, but such records would not change his opinion that Heard was capable of performing sedentary work at that time. (R. at 129).

### C.    Vocational Expert Benjamin's Testimony

Melissa Benjamin also testified as a vocational expert at the second hearing about jobs in the national economy that Heard could perform given his age, education, work experience, and RFC.[12] (R. at 129.) Benjamin concluded that Heard was unable to perform any of his prior occupations because of their exertion demands and Heard's residual functional capacity for only sedentary work. (R. at 132.) She stated that Heard lacked transferable skills, was able to stand or walk for two hours and sit for six hours, and was cane-dependent. (R. at 131-32.) With those limitations, Benjamin testified that sedentary unskilled jobs such as inspector/sorter, bench packager, and assembler were appropriate for Heard and existed in the Chicago area. (R. at 132-33). Adding an option to sit or stand during employment would reduce the number of available jobs by 10%, Benjamin testified, but she noted that the manufacturing jobs she suggested allow for a sit/stand option. (R. at 133-34.) Benjamin recognized that if Heard was "off task" for more than 15% of the workday or missed more than approximately one day a month, then he would not be capable of obtaining the employment she outlined. (R. at 134-35.) Benjamin based her opinions on the Dictionary of Occupational Titles except for her professional opinion that a sit/stand option would reduce the number of available jobs by 10%. (R. at 136.)

---

[12]    Benjamin's professional qualifications are not in the record. Vocational expert Edward Pagella, who is a Certified Rehabilitation Counselor and a Licensed Professional Counselor, was sent a notice to testify at Heard's second hearing, but he did not. (R. at 185.)

### D.    Other Evidence

ALJ Kossek also considered an adult third-party function report from Heard's friend William Barnes dated April 26, 2007.  (R. at 266-73.)  That report form from the Bureau of Disability Determination Services allows a third-party to explain the claimant's daily activities and physical capabilities from a lay perspective.  Barnes noted that Heard lives in an apartment with a friend but does not take care of anyone else.  (R. at 266-67.)  Barnes reported that Heard does not have any problems with personal care and is able to cook for himself and do most household chores as long as he does not have to be on his feet for "too long."  (R. at 268.)  According to Barnes, Heard also goes out daily, watches tv, plays cards, and does woodworking.  (R. at 268-69.)

Barnes reported that Heard could climb ladders and work on roofs before his injury, but now cannot use his ankle "too much."  (R. at 267.)  Barnes also stated that Heard's injury affects his ability to sleep when his ankle occasionally swells and causes pain, and that his ankle impairs Heard's ability to participate in his woodworking hobby and "other handyman services." (R. at 267-69.)  Barnes wrote that Heard's ankle limits his ability to lift, reach, squat, walk, climb stairs, stand, kneel, and complete tasks, but he completes tasks when he starts them.  (R. at 270.) Barnes reported that Heard uses a cane only when his foot is "really hurting."  (R. at 271.)

## IV.    ALJ Kossek's Findings

ALJ Kossek concluded that Heard was not disabled under sections 216(I) and 223(d) of the Social Security Act.  (R. at 21.)  She found that Heard (1) met the insured status requirements; (2) was not substantially gainfully employed between his alleged onset date and his date last insured; (3) is impaired by degenerative arthritis in his right ankle; and (4) has an impairment causing "more than minimal limitations to [Heard's] ability to perform basic work activities." (R. at 16.)  She concluded, however, that Heard's impairment did not meet or medically equal a listed impairments pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 1—particularly listing 1.02(A), Major Dysfunction of a Joint—because Heard's ankle problems have "not resulted in the

claimant being unable to ambulate effectively as that term is defined in Listing 1.00(B)(2)(b)." (R. at 17.) ALJ Kossek found that Heard has the capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567, except that he can only occasionally climb, kneel, stoop, crouch, or crawl, and he is dependent on a cane. (*Id.*)

In making her determinations, ALJ Kossek considered Heard's credibility by comparing his testimony with medical and other evidence. ALJ Kossek concluded that Heard's statements about his symptoms were not credible because of the minimal objective evidence supporting them. In her view, the records concerning his alleged symptoms are consistent with the RFC assessment that he was capable of sedentary work. The absence of any substantial treatment during 2003 and 2004 undermined Heard's assertion that his ankle problems were so severe they prevented him from performing any work, ALJ Kossek reasoned, especially because Dr. Jubert's contemporaneous records from November 2003 observed only "palpable dorsalis pedis and posterior tibial pulses bilaterally; pain on range of motion; and well-healed surgical scars." (R. at 17-18.) Though Dr. Jubert recommended an arthrocentesis procedure in November 2003, there is no evidence that Heard actually underwent such a procedure. (*Id.*) Nor are there any contemporaneous notes from Dr. Jubert about the two x-rays he ordered for Heard in November 2003 and January 2004. (*Id.*) Though Dr. Jubert reported in April 2007 that the x-rays "showed signs of degenerative joint disease secondary to previously fractured surgically repaired tibia and fibula bones of the right ankle," ALJ Kossek found that assessment inconsistent with Dr. Jubert's contemporaneous treatment notes, which do not indicate a diagnosis of degenerative joint disease until "August of 2005 at the earliest, possibly even January of 2007." (*Id.*)

ALJ Kossek also commented on Heard's testimony. ALJ Kossek observed that Heard lacked objective evidence supporting his claims of ankle pain in 2004, especially because the level of treatment Heard he received in 2004 was not commensurate with the level of pain he claimed to suffer. (R. at 19.) Heard testified at the hearings that his ankle was "the same" as in 2004 and

he can walk only one block without his cane. (*Id.*)  Heard also testified, however, that he lives alone, can perform basic activities like cooking and light housekeeping, and does light grocery shopping if someone takes him to the store. (R. at 18.)  Though Heard testified he began using crutches or a cane in 2004, he never received physical therapy.  He described his ankle pain as at a level 9 out of 10 while standing, but took only over-the-counter pain medications to control it. (*Id.*)

Nor did Heard seek medical treatment for his alleged back pain during the applicable time period. (R. at 19. )  Heard asserted that his lower back hurt "most of the time" if he sits for "too long," approximately 90 minutes at a time. (R. at 18-19.)  ALJ Kossek noted the absence of medical evidence supporting Heard's claims of back pain, and took particular notice of the fact that though Heard said that he would be unable to do a sitting job because of his lower back pain, he was uncertain whether his back pain began in 2004. (*Id.*)  Since the treatment notes from the applicable time period include very little information regarding his ankle or lower back, especially when compared to aggressive treatment Heard later underwent in 2007, ALJ Kossek concluded that Heard magnified the severity and timing of his ankle and lower back pain. (*Id.*)

ALJ Kossek gave little weight to Dr. Kim's RFC assessment because it deemed Heard less limited than the record as a whole suggested he was. (R. at 19.)  ALJ Kossek afforded greater weight to Dr. Jimenez's RFC assessment, which concluded that Heard was capable of only sedentary work in keeping with "the overall evidence." (*Id.*)  ALJ Kossek therefore gave considerable weight to Dr. Jimenez's finding that Heard did not suffer from a disabling impairment on or before the date last insured. (*Id.*)

ALJ Kossek gave the most weight to Dr. Charous's opinions because he had the opportunity to observe Heard's testimony and review the entire record. (*Id.*)  Dr. Charous testified that Heard's impairment on the date last insured limited him to sedentary work because he required a cane to walk, and that Heard's medical records do not support his testimony about a lower back

11

impairment. (*Id.*) ALJ Kossek also assigned great weight to the third-party report by Heard's friend Barnes, which she found supported the RFC assessment that Heard can perform sedentary work. As Kossek pointed out, Barnes reported that Heard could complete "'most chores, provided that he doesn't have to be on his feet too long," went out on a daily basis and alone, drove, shopped, had no problems with personal care, and cooked. (R. at 20.)

In sum, ALJ Kossek pointed to the following support for the RFC assessment taht Heard was able to perform sedentary work, but could only occasionally climb, kneel, stoop, crouch, or crawl: (1) Heard's minimal treatment records from the relevant time period; (2) Barnes's report that Heard is capable of many tasks; (3) Heard's questionable credibility; and (4) Dr. Charous's opinion . ALJ Kossek noted that though Heard was forty-four years old on the date last insured and has a limited education, he can communicate in English. (*Id.*) ALJ Kossek concluded that even if Heard needed to use a cane in 2004, the record suggests Heard could perform at least sedentary work. (*Id.*)

ALJ Kossek also determined that Heard was unable to complete any past relevant work based on the RFC determination and VE Benjamin's testimony . The transferability of Heard's job skills for future work did not alter ALJ Kossek's conclusion, however, because the Medical-Vocational Rules framework supports a finding that Heard is not disabled regardless of whether he has transferable job skills. (*Id.*) According to Benjamin, given Heard's RFC capacity to perform unskilled sedentary work with additional limitations, Heard could satisfy the requirements of an assembler, bench packager, and inspector/sorter—all jobs which exist in the Chicago metropolitan area. (*Id.*) ALJ Kossek found that testimony consistent with the information contained in the Dictionary of Occupational Titles. (*Id.*) Based on Benjamin's testimony and Heard's age, education, work experience, and the RFC evidence, ALJ Kossek concluded that Heard was "capable of making a successful adjustment to other work that existed in significant number in the national economy" in March 2004 and thus was not disabled at that time. (*Id.*)

**DISCUSSION**

## I.    Standard of Review

The Social Security Act ("SSA") authorizes judicial review of the Administration's final decision about benefits and directs that the Commissioner's factual findings be accepted as conclusive so long as they are supported by substantial evidence and based on the correct legal standard. 42 U.S.C. § 405(g); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal quotation marks and citations omitted). The ALJ must articulate her analysis of the evidence in order to show an "accurate and logical bridge" from the evidence to her conclusion and to allow the reviewing court to trace her reasoning. *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (internal quotation marks and citations omitted). The court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (courts should affirm an ALJ even if "reasonable minds could differ").

## II.   Analysis

To be eligible for disability benefits, a claimant must establish that he is disabled. The SSA and applicable regulations define a disability as an inability to engage in any substantial gainful activity because of a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423 (d)(1)(A), 1382c(a)(3)(A). A claimant's impairment must prevent him from engaging in any substantial gainful activity that exists in significant numbers in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(g), 416.920(e)-(f). The SSA uses a five-step test to evaluate whether the claimant is entitled to benefits, examining whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe

impairment or combination of impairments; (3) the impairment meets or equals a listed impairment in the appendix to the regulations; (4) the claimant cannot perform his past relevant work; and (5) the claimant cannot perform any other work in the national economy. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. §§ 404.1520). The claimant carries the burden of proof through step four; the burden shifts to the Commissioner for step five. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The RFC determination used in steps four and five must also be based on all the relevant evidence of record. *Id.* (citing 20 C.F.R. § 404.1545(a)(1)).

In his motion for summary judgment, Heard argues that ALJ Kossek: (1) erroneously failed to proffer to Heard exhibits she entered into the record; (2) did not develop an adequate record because she did not obtain the prior claim file; (3) erroneously evaluated Heard's need for a cane; (4) did not ask Dr. Charous key questions; (5) erroneously evaluated treating Dr. Jubert's reports and letter from April 2007; (6) erroneously evaluated Dr. Jimenez's RFC assessment; and (7) erred in her judgment about Heard's credibility. (Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. [19], hereinafter "Pl.'s Mem." at 4-13.) The court examines each of the arguments in turn, grouping together all of Heard's contentions touching on the RFC assessment. The court also begins by noting that Heard lacked representation at the hearings before ALJ Kossek.

## A. Heard's Representation at the Hearings

Heard highlights the fact that he lacked representation in the hearings before ALJ Kossek. (Pl.'s Mem. at 5.) The Seventh Circuit has held that "[w]hile a claimant bears the burden of proving disability, the ALJ . . . has a duty to develop a full and fair record." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (reversing ALJ's decision for failure to develop the record). When a claimant appears without representation, the ALJ must "scrupulously and conscientiously probe" all relevant facts. *Id.* A "significant" and "prejudicial" omission is usually required for a finding that a *pro se* claimant was not adequately assisted, however, and "[m]ere conjecture or speculation that additional evidence might have been obtained . . . is insufficient to warrant a remand." *Id.* (internal

quotation marks and citations omitted). In this case, ALJ Kossek made clear to Heard that he was entitled to representation at the hearings. She also ordered a second hearing so that Heard would have time to collect medical records. Unlike *Nelms*, where an ALJ did not consider updated medical records showing degeneration in the claimant's condition, there is no showing of a prejudicial evidentiary gap here. ALJ Kossek sought out and considered all of Heard's medical records, and she actually weighed Heard's current treatment records as part of her decision. Nor does Heard identify any specific piece of evidence that she neglected to examine. Heard's lack of representation is therefore not cause for remand.

**B.      ALJ Kossek's Failure to Proffer Exhibits Entered into the Record**

Heard contends that ALJ Kossek "based her decision on evidence never provided to Heard" because she admitted exhibits into the record at his hearings without asking him whether he wanted to review them or had reviewed them. (Pl.'s Mem. at 5.) Heard contends that ALJ Kossek therefore violated his right to procedural due process and the Social Security Administration's Hearings, Appeals and Litigation Law Manual ("HALLEX"). (Pl.'s. Mem. at 4-5, citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950) (due process requires notice before a deprivation of property); HALLEX § I-2-6-58(B) (directing an ALJ to obtain specific acknowledgment that the claimant has examined the exhibits and ask if there are any objections to admitting the exhibits).) Heard's attempted application of *Mullane* is unconvincing, however, because that case does not even come close to establishing that an ALJ's failure to specifically ask whether the claimant has reviewed evidence constitutes a violation of due process. *See Mullane*, 339 U.S. at 314-20 (holding that notice published in a local newspaper was insufficient to inform beneficiaries whose addresses were ascertainable about changes to trust accounts). Heard's argument that *Mullane* applies to Social Security cases–an argument the Commissioner contests–is therefore

irrelevant.[13] (Pl.'s Mem. at 4-5.)  The court is not persuaded that there was a due process violation in ALJ Kossek's failure to be more solicitous of Heard to ensure he reviewed the evidence.  ALJ Kossek sent Heard a Notice of Hearing on both October 8, 2009 and March 5, 2010, which explained his right to review all the evidence admitted at the hearing.  (R. at 168-72, 187-91.)  She also provided Heard more time after the first hearing to collect and supply missing medical records, and Heard does not identify any specific evidence that he believes ALJ Kossek should or should not have reviewed.  The record therefore indicates that Heard was offered the full and fair hearing the law requires.

Heard's attempts to argue that ALJ Kossek's actions denied him procedural due process because they violated HALLEX § I-2-6-58(B) requirement that an ALJ obtain specific acknowledgment that a claimant examined the exhibits.  (Pl.'s Mem. at 4-5.)  That argument also fails.  The Seventh Circuit has not yet decided if HALLEX guidelines create enforceable rights, *Davenport v. Astrue*, 417 F. App'x. 544, 547 (7th Cir. 2011) (noting circuit court split about whether HALLEX creates enforceable rights), but local district courts have repeatedly held that they do not.  *See, e.g., Anderson v. Astrue*, No. 09 C 2399, 2011 WL 2416265, at *11 (N.D. Ill. June 13, 2011) ("HALLEX lacks the force of law . . . and is 'entitled to respect' only to the extent that it is persuasive").  The court agrees that any violation of HALLEX guidelines in Heard's case did not amount to a denial of due process.

### C.    Development of an Adequate Record Without Obtaining the Prior Claim File

Heard next urges that ALJ Kossek's failure to obtain his prior claim file, as is routine, was an error that warrants remand.  (Pl.'s Mem. at 6-7.)  Heard asserts that ALJ Kossek should have

---

[13]    See Pl.'s Mem. at 4-5, citing *Wilburn v. Astrue*, 626 F.3d 999 (8th Cir. 1999) (indicating that a claimant's rights were not violated when the ALJ was changed just prior to the hearing); *Flatford v. Chater*, 93 F.3d 1296 (6th Cir. 1996) (holding that a claimant is not guaranteed the right to cross-examine every physician providing evidence); *Gonzalez v. Sullivan*, 914 F.2d 1197 (9th Cir. 1990) (holding that notice was insufficient to advise the claimant of the need to request reconsideration).

reviewed and admitted into evidence the prior records and decisions of the previous ALJs, particularly the hearing and decision of ALJ Logan. (Pl.'s Mem. at 6.) He argues that ALJ Kossek's reliance on the scant treatment records from 2003 and 2004 imposed an obligation on her to obtain the prior file to determine if there was any additional evidence about Heard's condition at that time. (Pl.'s Mem. at 7). As support, Heard cites HALLEX § I-2-6-58(A), which requires an ALJ to obtain prior hearing records or explain why she did not obtain them. In response, the Commissioner cites *McMurtry v. Astrue*, where a Wisconsin district court determined that an ALJ's failure to admit records did not rise to the level of reversible error. (Def.'s Opp'n to Pl.'s Mot. [23], hereinafter "Def.'s Opp'n", at 8, citing 749 F. Supp. 2d 875, 880 (E.D. Wis. 2010). As in this case, the plaintiff in *McMurtry* invoked HALLEX § I-2-6-58 and argued that the ALJ should have reviewed the prior claim file resulting in an unfavorable determination for the plaintiff, but the plaintiff failed to specify which records should have been reviewed and why. 749 F. Supp. 29 at 880-81.

After reviewing the transcript from the hearings with ALJ Logan, this court finds no error in failing to admit the transcript or hearing into the record. ALJ Logan determined Heard was no longer disabled in 2003 and ALJ Kossek was reviewing a time period almost one year later. It is difficult for this court to understand how the failure to obtain a prior claim file of an unfavorable determination could rise to the level of reversible error. Nor is the court persuaded by the HALLEX guidelines that ALJ Kossek's actions prejudiced Heard. ALJ Kossek's failure to obtain the prior file therefore did not prevent Heard from obtaining a full and fair hearing.

### D.     Evidence Supporting the RFC Assessment

Heard argues that the RFC assessment ALJ Kossek used was not supported by substantial evidence because she (1) erroneously evaluated Heard's dependence on a cane; (2) did not properly question Dr. Charous; (3) erroneously evaluated Dr. Jubert's April 2007 opinions; and (4) mis-characterized Dr. Jimenez's November 2007 report. The court examines each of these arguments in turn, but, for the reasons explained below, concludes that ALJ Kossek's RFC

17

assessment that Heard was capable of sedentary work was supported by substantial evidence.

### 1. ALJ Kossek's Evaluation of Heard's Need for a Cane

Heard complains that ALJ Kossek found that Heard was "dependent on a cane" without clarifying the extent of his dependence, including whether Heard relied on it for standing or walking. (Pl.'s Mem. at 7-8.) Heard contends that the ALJ's lack of clarity led the vocational expert, Benjamin, to assume that Heard only needed a cane to walk, not to stand, so the suitable jobs Benjamin identified did not account for the Heard's need to hold a cane in one hand while working. (Pl.'s Mem. at 8.) Heard urges that ALJ Kossek's failure to differentiate between using a cane for ambulation or to stand prejudiced him.

Heard testified that he could not walk further than one block without a cane and that walking any distance caused extreme discomfort. (R. at 17, 101, 115-17.) Benjamin testified, however, that 90% of the occupations she identified as potential work for Heard could be completed using a sit/stand option. (R. at 133-34.) Though Heard asserted that he could not complete a sitting job because he experienced lower back pain after sitting for more than an hour, there was no medical evidence suggesting that back pain would place a job with a sit/stand option beyond Heard's capabilities. (R. at 115, 120-123, 128.) Dr. Charous testified that the medical evidence did not support Heard's claim that he had debilitating lower back pain, and an x-ray of Heard's spine revealed no irregularities. (R. at 128, 317.) ALJ Kossek's failure to clearly articulate to Benjamin that Heard always needed a cane to stand was not an error in light of the fact that the jobs that Benjamin suggested jobs permitted standing and sitting options. Nor did ALJ Kossek err by failing to ask Benjamin about the potential hazards in a manufacturing setting for someone with a cane. (Pl.'s Mem. at 10.) Plaintiff offers no basis for suspicion that Benjamin, a vocational expert, failed to consider the dangers of a potential work environment.

Heard also argues that ALJ Kossek rejected, without "good reasons", Dr. Jubert's conclusion in his April 2007 arthritic report that Heard needed a cane to stand, walk, and balance

all of the time. (Pl.'s Mem. at 9-10, citing 20 C.F.R. § 404.1527(c)(2).[14]). ALJ Kossek discussed the weight she accorded Dr. Jubert's opinions as a whole, however, and noted that even though Dr. Jubert treated Heard for several years, there were few visits from 2003 to 2005. (R. at 18.) She also highlighted that Dr. Jubert's own treatment notes did not show a diagnosis of degenerative joint disease until August 2005 at the earliest, contradicting Dr. Jubert's April 2007 conclusions. (R. at 18, 364-65.) The Seventh Circuit has noted that the weight of a treating physicians' testimony may be considered in light of the "well known" reality that "many physicians (including those most likely to attract patients who are thinking of seeking disability benefits) will often bend over backwards to assist a patient in obtaining benefits." *Holslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (internal citations omitted). Though ALJ Kossek should have expressly acknowledged Dr. Jubert's arthritic report, the fact that she neglected to do so does not, by itself, require remand. ALJ Kossek's RFC assessment does not lack substantial evidentiary support because of her findings about Heard's dependence on a cane.

### 2. ALJ Kossek's Questioning of Dr. Charous

Heard next contends that substantial evidence does not support the RFC assessment because the ALJ did not ask Dr. Charous critical questions, including "whether Heard needed a cane to stand;" "how long Heard could sit, stand, and walk without interruption;" what "percentage of the day, if any, Heard could be expected to be off task due to pain;" and "how many absences per month from work Heard could have." (Pl.'s Mem. at 10-11.) The court disagrees. Heard's argument implies that ALJ Kossek should have asked Dr. Charous the same questions she asked Benjamin, but no authority suggests that an ALJ must ask the same questions of every witness. ALJ Kossek's questioning of Dr. Charous provided a full and fair opportunity to adequately develop

---

[14]     Heard cites 20 C.F.R. § 404.1527(d)(2), but the relevant regulation was moved. *See* 20 C.F.R. § 404.1527(c)(2) (directing that an ALJ "always give good reasons . . . for the weight we give to the treating source's opinion.").

the record. ALJ Kossek allowed Dr. Charous to question Heard, and asked Dr. Charous to explain, based on the record, what medical conditions Heard had on March 31, 2004. (R. at 125.) Dr. Charous noted that Heard had "some severe degenerative arthritis of his right ankle" and his impairments limited him to sedentary work because he had a limited ability to walk, used a cane, and had difficulty lifting heavy objects. (*Ia.*) Dr. Charous also testified, in response to ALJ Kosseck's inquiry, that the record did not reflect that Heard suffered from lower back pain. (R. at 128) ALJ Kossek nevertheless asked Dr. Charous what Heard would be able to do in 2004 if he did suffer from back pain, and Dr. Charous affirmed that Heard could still perform sedentary work. (*Id.*) ALJ Kossek's questioning of Dr. Charous therefore met the standard of a full and fair hearing for Heard.

Heard also urges that ALJ Kossek made procedural errors in violation of HALLEX when she did not verify either that Dr. Charous's medical license was active and in good standing or that he had reviewed all pertinent evidence. (Pl.'s Mem. at 11, citing HALLEX § I-2-5-39(A) (requiring that an ALJ ensure on the record that the medical expert has examined all evidence and that the record contains an accurate statement of the medical expert's professional qualifications).) The Commissioner emphasizes in response that the only requirement set forth by HALLEX is that "the record contain an accurate statement of the ME's professional qualifications." (Def.'s Opp'n at 13.) The court is again skeptical of the force of HALLEX guidelines, but it makes no difference in this case because the record does contain an accurate statement of Dr. Charous professional qualifications, and ALJ Kossek asked Dr. Charous to provide his opinion in light of all the evidence in the record. (R. at 126, 186.) ALJ Kossek did not commit any reversible error when eliciting Dr. Charous's testimony, and the RFC assessment does not lack substantial evidentiary support because of her questioning of Dr. Charous.

### 3. ALJ Kossek's Evaluation of Treating Podiatrist Dr. Jubert's Opinions

Heard argues that ALJ Kossek erroneously disregarded Dr. Jubert's statements in his 2007

letter about Heard's prior x-rays, dismissed his 2003 arthritis diagnosis, and should have contacted Dr. Jubert when she questioned his 2007 evaluation of the earlier x-ray results. (Pl.'s Mem. at 11-12, citing 20 C.F.R. § 404.1512(e) (noting that ALJs will make "every reasonable effort to obtain evidence from your medical sources")).) The record defeats these contentions. ALJ Kossek noted that Dr. Jubert's report in April 2007—stating that x-rays from November 2003 and January 2004 "showed signs of degenerative joint disease"—was written more than three years after the x-rays were taken. She also stressed that Dr. Jubert "did not identify the claimant's ankle condition as degenerative joint disease until August of 2005 at the earliest." (R.at 18, 354, 364-65.) Although ALJ Kossek did not specifically address Dr. Jubert's arthritic report dated April 23, 2007, the letter that she did explicitly evaluate was sent with that report. ALJ Kossek was justified in observing that Dr. Jubert's report was written more than three years after the date last insured and unsupported by any treatment notes from the pertinent time period. As Defendants argue, so-called "retroactive diagnoses" can be of dubious credibility. (Def.'s Opp'n at 10-11, citing *Estok v. Apfel*, 152 F.3d 636, 638-40 (7th Cir. 1998) (physician's retroactive diagnosis was not supported by substantial evidence since it was not "corroborated by evidence contemporaneous with the eligible period")).) Dr. Jubert's 2007 diagnosis was unsupported by his own treatment notes from the relevant time period. Noting the changes and timing in Dr. Jubert's opinions did not oblige ALJ Kossek to contact Dr. Jubert directly. ALJ Kossek's evaluation of Dr. Jubert's assessments does not require reversal.

### 4. ALJ Kossek's Evaluation of Dr. Jimenez's November 2007 Report

Heard next contends that ALJ Kossek mis-characterized Dr. Jimenez's November 2007 report that Heard could occasionally lift ten pounds, frequently lift less than ten pounds, stand or walk for significantly less than two hours a day, and sit for about six hours in an eight-hour workday. (R. at 335.) Dr. Jimenez reported that there was insufficient evidence of Heard's condition in 2004. (*Id.*) Heard argues that Dr. Jimenez's report therefore supports a finding that Heard was unable to work full-time in 2004. Heard contends that the lack of evidence showing his condition worsened

between 2004 and 2007 and the consistency between Dr. Jubert's and Dr. Jimenez's opinions mean that ALJ Kossek's conclusion that Heard could perform sedentary work in 2004 was not supported by substantial evidence. (Pl.'s Mem. at 12-13.)

The court is not persuaded. Dr. Jimenez generally agreed with Dr. Jubert's opinions in the absence of any contrary evidence, but he explicitly noted there was "insufficient evidence to establish a disabling impairment on or before his date last insured for benefits as of 3/31/04." (R.at 333.) As the Commissioner notes, it is Heard's duty to present medical evidence that a impairment exists. (Def's Opp'n at 12, citing *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008).) ALJ Kossek determined that Dr. Jimenez's opinion was consistent with other medical evidence supporting a finding that Heard was capable of sedentary work. An ALJ's determination is entitled to deference even in cases where "evidence . . . would allow reasonable minds to differ as to the severity of [an] impairment." *Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005) (citations omitted). ALJ Kossek's RFC assessment that Heard is capable of sedentary work does not lack substantial evidentiary support because of her evaluation of Dr. Jimenez's report.

### E. ALJ Kossek's Adverse Credibility Finding

Finally, Heard challenges ALJ Kossek's determination that his testimony was not wholly credible. (Pl.'s Mem. at 14.) Heard complains that ALJ Kossek suggested that Heard would have sought more or different treatment if he were as impaired as he claimed to be, but she did not identify any other treatments he could have sought. (*Id.*) Heard also urges, without explanation, that ALJ Kossek's assessment of the statement from Barnes, Heard's friend, was flawed. (Pl.'s Mem. at 15.)

An ALJ must consider the entire record and include specific reasons for a credibility finding. *See Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009) (holding that ALJ's credibility determination was faulty when medical evidence contradicted the determination and the ALJ failed to analyze the factors established under SSR 96-7p), *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000)

(recognizing that a lack of medical evidence alone is insufficient to discredit medical testimony). The court treats an ALJ's credibility finding with deference, however, because "the ALJ is in the best position to see and hear the witness." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). Only a determination "so lacking explanation and support that we find it patently wrong" will be reversed. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (internal quotations marks and citations omitted).

In this case, ALJ Kossek identified Heard's failure to seek treatment during the relevant time period as a principal reason for not considering Heard credible. (R. at 19.) She acknowledged that Heard suffered a serious ankle injury, but explained that no medical evidence supported his complaints about back pain. ALJ Kossek also compared the extensive treatment Heard received in 2007 to the scant treatment records from the relevant time period. Dr. Jubert's treatment notes reflected that Heard missed appointments as time progressed and Heard appeared to fail to follow through with scheduled procedures. (R. at 359, 365, 367.) Most importantly, Dr. Jubert did not officially prescribe a cane until October 26, 2009, five years after the last insured date. (R. at 356.) ALJ Kossek also directly quoted Barnes's third-party function report that Heard "can do most chores, provided [that] he doesn't have to [be] on his feet for too long." (R. at 20, 268.) Heard contends this testimony shows he is incapable of any work. (Pl.'s Mem. at 14.) As ALJ Kossek noted, however, Barnes reported that Heard could cook; leave the house alone; manage his personal care and finances; had no issues with memory or concentration; and that he "only [uses] the cane if his foot is really hurting." (R. at 20, 268-71.) ALJ Kossek's conclusions about Heard's credibility were supported by substantial evidence and are entitled to deference.

**<u>CONCLUSION</u>**

Plaintiff's motion for summary judgment [18] is denied, and the Commissioner's final

decision to deny Disability Insurance Benefits is affirmed.

ENTER:

Dated: August 30, 2013

_____

REBECCA R. PALLMEYER
United States District Judge

24